UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : No. 3:16-CR-127-5 |
| v. | : |
| | : (Judge Caputo) |
| DAVON BECKFORD a/k/a Dolo | : |
| a/k/a Jaquan Wilson, | : |
| Defendant | : |

## GOVERNMENT'S SENTENCING MEMORANDUM

I. Introduction

Defendant Davon Beckford pleaded guilty to conspiring to distribute less than 10 grams of heroin. Despite his youth, the defendant has already accrued convictions for crimes of violence and narcotics trafficking. His criminal activities also bear a recurring and disturbing theme: the presence of firearms. In consideration of the defendant's contribution to our nation's heroin crisis, the United States respectfully requests that the Court impose a sentence of imprisonment at the upper end of the defendant's sentencing guidelines range of 15 to 21 months.

II. Factual and Procedural Background

Beckford is a 22-year-old man from New York, New York who recently located to northeastern Pennsylvania. *See* Presentence Report ("PSR") ¶¶ 32,35. On September 19, 2016, he pleaded guilty to one count

1

of conspiring to distribute heroin, in violation of Title 21, United States Code, Section 841(a)(1). *Id.* at ¶ 3. In exchange for the defendant's plea and following his sentencing, the United States has agreed to dismiss two counts for distributing heroin. *Id.* Beckford recently completed a New York state sentence for a robbery conviction. He now stands before the Court for sentencing on his federal charges.

Law enforcement officials identified the defendant during the course of an investigation into heroin and crack cocaine traffickers in the Wilkes-Barre, Pennsylvania area. *Id.* at ¶ 5. The investigation resulted in Beckford and five other individuals being charged on the federal level, and several other individuals being charged in state court.

On February 9, 2016, federal agents executed a search warrant at the residence of co-defendants Truman Jones and Al Dunlap in Wilkes-Barre, recovering dozens of grams of heroin and crack cocaine, and three loaded firearms. *Id.* at ¶ 6. Agents tracked one of the firearms, a DoubleTap Derringer, to purchaser and co-defendant Na'Deardra Mayhams, who was in a relationship and shared a residence with Beckford. *Id.* at ¶ 34. Witnesses advised that Mayhams had traded the firearm to repay an outstanding drug debt that she owed jointly with Beckford. *Id.* at ¶ 10.

Within a month of executing the warrant, law enforcement officials twice used a confidential informant to purchase heroin from Beckford. *Id.* at ¶¶ 7-8. Beckford sold the informant 50 bags of heroin on each occasion; once in exchange for $350 and once in exchange for $300. *Id.* The heroin sold to the informant during the first controlled buy came in bags bearing stamps that matched those found at the Jones and Dunlap residence. *Id.* The drug deals occurred in close proximity to the apartment that Beckford shared with Mayhams and her young children at the Hilltop Apartments complex in Edwardsville, Pennsylvania. *Id.*

In April 2016, Beckford was incarcerated in New York for unrelated robbery charges. *Id.* at ¶¶ 9,27. When agents attempted to arrange a third controlled buy of heroin from Beckford, they were contact by Mayhams, who subsequently sold the confidential informant 48 bags of heroin in exchange for $350. This this drug deal again occurred near the apartment that she had shared with Beckford prior to his incarceration.

Law enforcement officials subsequently executed a federal search warrant at the Beckford and Mayhams apartment, recovering several grams of heroin and crack cocaine, and a loaded Cobra handgun. *Id.* at ¶ 10. This handgun, like the DoubleTap Derringer recovered from the Jones and Dunlap apartment, had also been purchased by Mayhams

prior to Beckford's incarceration in New York. *Id.*

The parties have stipulated that the defendant's offense conduct involved less than 10 grams of heroin. (Doc. No. 80 at ¶ 10(a).) Although it is the government's position that there is no evidence to suggest Beckford was also involved in crack cocaine trafficking, the evidence established that he constructively possessed Mayhams's firearms.

### III. Procedure

Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), which rendered the United States Sentencing Commission Guidelines Manual ("USSG") advisory, the Court of Appeals set forth a three-step process when imposing a sentence:

1. Courts must continue to calculate a defendant's USSG sentence, regardless of *Booker*;

2. In doing so, they must formally rule on the motions of both parties, state on the record whether the Court is granting a departure and how that departure affects the USSG calculation, and consider pre-*Booker* case law, which continues to have advisory force; and

3. Courts are required to exercise their discretion by considering the relevant factors set forth in Title 18, United States Code,

Section 3553(a), when imposing a sentence, regardless of whether it varies from the sentence calculated under the USSG. *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006).

Each of these steps is addressed below.

## IV. Argument

### A. Sentencing Guidelines Calculation

As his narcotics trafficking involved less than 10 grams of heroin, the defendant's base offense level is 12 under the advisory Sentencing Guidelines. PSR ¶ 12. The United States agrees that a two-level enhancement for possession of a firearm is appropriate. *Id.* at ¶ 18. The investigation established that Beckford sold heroin in close proximity to the apartment that he shared with his co-defendant, Na'Deardra Mayhams. During a subsequent search of that apartment, within weeks of Beckford's incarceration in New York State, law enforcement recovered narcotics and a loaded .380 Cobra handgun. *Id.* at ¶ 10. Moreover, informants advised law enforcement that a second firearm purchased by Mayhams, and recovered by law enforcement from an apartment shared by two other co-defendants, had been traded to those co-defendants to repay an outstanding drug debt shared by Mayhams and Beckford. *Id.* Mayhams had purchased both handguns prior to Beckford's two sales of

heroin to a confidential informant.  They thus were "dangerous weapons" possessed, actually and constructively, by co-tenants Beckford and Mayhams during the course of their trafficking activities, pursuant to USSG § 2D1.1(b)(1).

The Sentencing Guidelines recognize the "increased danger of violence when drug traffickers possess weapons," and have penalized it accordingly.  *Id.* at cmt. 11(A).  A broad standard determines whether a weapon possession enhancement is warranted: "The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.  For example, the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet."  *Id.*  Here, the connection between the firearms and the defendant's trafficking activities is clear.  The .380 Cobra handgun was kept, loaded and in close proximity to narcotics, in a residence shared by Beckford and Mayhams during their trafficking activities, and also inhabited by Mayhams's young children.  The DoubleTap Derringer was reportedly traded to two co-defendants to offset a drug debt owed by Beckford and Mayhams.  A two-level enhancement for Beckford's firearm possession is warranted, bringing his adjusted offense level to 14.  *Id.* at ¶ 22.

To his credit, Beckford accepted responsibility for his crimes in a timely fashion, as evidenced by the plea agreement entered in this matter and his associated colloquy. *Id.* at ¶ 14. Accordingly, the United States agrees that he should receive a two-level reduction in his offense level, pursuant to USSG § 3E1.1. (Doc. No. 80 at ¶ 11.) The resulting total offense level of 12 advises a sentencing range of 15 to 21 months of imprisonment. PSR at ¶ 45.

B. The Parties' Motions

The Probation Department did not identify any factors that warrant a departure from the advisory Sentencing Guidelines range. *Id.* at ¶ 58. Neither the defendant, nor the United States has moved for an upward or downward departure.

C. Assessment of Relevant § 3553(a) Sentencing Factors

The final step in the sentencing process is for the Court to consider all applicable factors set forth in Title 18, United States Code, § 3553(a) when fashioning an appropriate, individualized sentence. Here, a sentence at or near the upper end of the defendant's sentencing guidelines range would meet the goals of punishment, deterrence and potential rehabilitation.

At the age of 17, the defendant participated in an armed robbery

and subsequently received a 12½-year state sentence. PSR ¶ 27. During the robbery, Beckford and his co-defendant brandished a firearm and a knife in the course of taking their victim's personal belongings. *Id.* Although Beckford was immediately paroled upon his sentencing for the state robbery (and placed on probation), he failed to take advantage of this opportunity to correct the course of his life.

Within two years of his parole, Beckford began supporting himself through illegal activities. *Id.* at ¶ 40. Shortly thereafter, he was arrested for his narcotics trafficking activities; criminal conduct which again involved the presence of a firearm. Despite his youth, the defendant already may qualify as a career offender should he be convicted of another crime of violence or controlled substance offense in the future. Despite being afforded an opportunity to turn his life around after being paroled for his robbery conviction, the defendant instead chose to profit from our nation's opioid and heroin epidemic.

There is a nationwide crisis in the use and availability of heroin. According to the U.S. Drug Enforcement Administration's 2016 National Heroin Threat Assessment, heroin use and availability are on the rise

and causing more overdose deaths than at any time in the last decade.[1] Indeed, the assessment states that in 2014, 10,574 Americans died from heroin related overdoses, more than tripling the number in 2010.

The United States Centers for Disease Control and Prevention ("CDC") characterizes the situation as "today's heroin epidemic."[2] The CDC advises that heroin use has increased across the nation among men and women, most age groups, and all income levels. As heroin use has increased, so have heroin-related overdose deaths. The CDC reports that between 2002 and 2013, the rate of heroin-related overdose deaths nearly quadrupled, and more than 8,200 people died in 2013.

The Middle District of Pennsylvania has not been spared from this epidemic. The Pennsylvania State Coroner's Association recently issued a report on drug-related overdose death statistics for 2015 which breaks down drug-related overdose deaths by county.[3] A review of that report is

---

[1] https://www.dea.gov/divisions/hq/2016/hq062716_attach.pdf.

[2] http://www.cdc.gov/drugoverdose/opioids/heroin.html.

[3] http://www.pacoroners.org/Uploads/Pennsylvania_State_Coroners_Association_Drug_Report_2015.pdf. It should be noted that not all drug-related deaths may have been reported to the coroner. The report includes statistics for all drug related overdose deaths and is not restricted to heroin-related overdose deaths. It also does not include overdoses that result in serious mental and physical injuries. Additionally, not known are the number of persons who overdose but survive or the number of deaths that are missed.

a grim reminder that drug-related overdoses, including heroin-related drug overdoses, are prevalent throughout the Middle District of Pennsylvania. Drug related deaths have continued to increase.  In 2014 that number reached at least 2,489 individuals.  The year 2014 showed an average increase of about 20% over the prior year for many counties.  In 2015 the number of drug related deaths increased to 3,505, which represents a 30% increase over the prior year.  This means than ten people die every day in Pennsylvania from drug related causes.  In York (99), Luzerne (96) and Dauphin (82) Counties alone, there were 277 drug-related overdose deaths reported.  If initial data for 2016 is any indication, the number of deaths will continue to increase.

  The United States respectfully requests that the Court reflect on these statistics and the havoc that heroin is wreaking in our community when it sentences Beckford.  The defendant, who makes no claim to trafficking heroin in an effort to feed a personal addiction, has taken advantage of and exacerbated the heroin crisis in Pennsylvania for nothing more than his own profit.

  Indeed, one dose of heroin, which sells on the street for approximately $10 to $15, contains approximately .025 grams of heroin.  That individual dose can be fatal, depending on its purity.  As referenced

in the presentence report and the plea agreement, the defendant is responsible for under 10 grams of heroin, which nonetheless equates to almost 400 potentially fatal doses. By any definition, this is a very serious offense, and the sentence this Court imposes should reflect that gravity. *See* 18 U.S.C. § 3553(a)(2)(A).

## V. Conclusion

Accordingly, the United States respectfully requests that the Court impose a sentence of imprisonment at the upper end of the defendant's sentencing guidelines range of 15 to 21 months.

April 3, 2017	Respectfully submitted,

BRUCE D. BRANDLER
United States Attorney

By: /s/ Phillip J. Caraballo
Assistant U.S. Attorney
William J. Nealon Federal Building
235 North Washington Avenue
Scranton, Pennsylvania 18503
570.348.2800

11

## CERTIFICATE OF SERVICE BY ELECTRONIC FILING

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers. On April 3, 2017, she served a copy of the enclosed

## GOVERNMENT'S SENTENCING MEMORANDUM

by electronic filing on William Ruzzo, counsel for defendant Davon Beckford.

/s/ Donna Borgia
Donna Borgia
Legal Assistant